## C.L.D. v. T.M.F.

*Darryl W. Cunningham,* for plaintiff.
*Claudia L. DeArment,* for defendant.

BLACKWELL, *J.,* February 19, 1993—Mother in this case alleges that father sexually abused their daughters. She seeks to suspend, if not terminate, any unsupervised visits by father. Father denies all of the allegations. The court finds that the mother in this case has not met her burden of proof by clearly and convincingly showing that the father' sexually abused or acted in a sexually inappropriate manner with his daughters. A recital of the facts and witnesses is now necessary.

On December 1, 1989, C.L.D. (father) filed an action seeking custody of L.M.D., date of birth, July 21, 1988. Prior to a February 22, 1990 hearing, N.L.D. was born on January 6, 1990, to T.M.S., now T.M.F. (mother). Father acknowledges paternity of L. and N.

At the February 22, 1990 hearing, father and mother agreed that mother would have majority physical custody of the two girls and that father would have L. alternate weekends, with a phased-in schedule as follows:

(A) Alternate Saturdays, from 9 a.m. until 6 p.m., for three months, commencing March 2, 1990;

(B) Alternate Sundays, from 9 a.m. until 6 p.m., for three months, commencing March 9, 1990;

(C) Then for three months alternate Saturdays, from 9 a.m. until Sunday at 6 p.m.; and then,

(D) Alternate weekends from Friday at 6 p.m. until Sunday at 6 p.m.

Father also had alternate holidays, one week in the summer for 1990 and 1991, and then in 1992 for two weeks. Christmas holidays were set forth for the father as being December 24 at noon, until December 25 at noon, in even-numbered years, and in odd-numbered years from December 25 at noon, until December 26 at noon. As for N., father was awarded the right to visit N. at mother's house with the parties to agree upon the expansion of custodial rights for father with N.

No pleadings were filed to indicate any problems with the above arrangement until February 21, 1992. At that time, father sought to expand his rights of minority physical custody to include an earlier pick-up time, alternate Halloweens, Father's Day, three weeks in the summer, two nights each week from 4 p.m. until 8 p.m., father's birthday, and alternate birthdays of the children. The conciliation conference was set for March 4, 1992. It is noted that, from the pleadings, no conference was held. On March 6, 1992, allegations of sexual abuse were raised alleging that father had sexually abused L. During the investigation, father, although contending the children had been brainwashed and that he had not done anything, agreed not to see the children until the investigation was completed. At this point in time, there was no allegation

that N. had been abused. The court, on May 18, 1992, issued an order that suspended father's rights of custody with L., and ordered supervised contact with N. Psychological evaluations of the parties were ordered. The order was based upon allegations of sexual abuse of L. by father and upon the investigation by York County Children and Youth Services Agency. A trial was conducted commencing October 7, 1992.

Cathy Utz, a caseworker for the agency, testified that, pursuant to her investigation, father was an indicated sexual abuser of L. and N. On March 6, 1992, the agency received a referral of sexual abuse of L. by father, and L. was interviewed on March 10, 1992, at the agency. L. stated to Ms. Utz that she saw her dad's "wee-wee" and that she had been in bed awake and naked when her dad was in bed asleep and naked. She also told the caseworker about putting ice on her dad's wee-wee. On March 27, 1992, L. met with Ms. Utz and Officer Zumbrum of the Hanover Police Department. When L. would not talk to Office Zumbrum, he left the room. L. then told Ms. Utz that the ice had made "wiggles" stick up.

A supervised visit did occur between father and the children. L. stated that she did not want to see father and that she thought father would steal her. Ms. Utz observed that N. was happy to see father, but that L. ran crying to mother. On April 2, 1992, the agency filed an indicated report of sexual abuse of L. and listed father as the perpetrator. Play therapy and art therapy were recommended as possible counseling for L.

Allegations concerning sexual abuse of N. were raised in June 1992 and investigated by Ms. Utz and Officer Zumbrum. When N. was interviewed on August 5, 1992, she stated that dad had poked her wee-wee with his finger

and made it hurt. On August 8, 1992, the agency indicated a finding of sexual abuse of N. with father listed as the perpetrator.

Ms. Utz's findings of abuse were based on (1) the children's statements to her; (2) Ms. Utz's beliefs that children of this age tend not to make up stories like those reported; and (3) that there was no indication mother, or anyone, was telling or coaching the children as to what to say. Ms. Utz's findings were not based on physical evidence, but on her experience as a caseworker in handling these cases and the children's stories. Ms. Utz's training and manner of conducting the interviews of the children establish her as a credible witness to the degree that she is and was involved with this case.

Sue Allen, who was qualified as a family and play therapist, testified as to her counseling of L. and N. She testified that she saw approximately 100 children in 1992, 15 of whom were sexually abused and the remainder were emotionally or physically abused. Ms. Allen then referred the children to Ms. Karen Stabley, an art therapist within the same group as Ms. Allen. Ms. Allen said she would not (and did not) push the children for information. She saw the children eight times and engaged the children in play therapy. Despite Ms. Allen's recommendation for continued counseling, mother ceased taking the children to therapy.

Of further interest to this court is Ms. Allen's testimony regarding the intake interview conducted with mother on June 3, 1992. According to Ms. Allen's testimony, mother was determined to insure that no visitation occurred between father and their daughters, would do anything she had to do to get her daughters away from father, was certain father had sexually abused L., and was searching for proof of abuse that would "hold up in court."

L. appeared to Ms. Allen to be an aggressive child who was very protective of her sister, N. Ms. Allen testified that L.'s protective attitude, aggressive behavior, description of interactions with father, and the need to protect herself (such as surrounding herself with stuffed animals whom she designated mom, step-father, and protectors, or using a make believe gun to kill the "mean-man") are indicative of sexual abuse. Ms. Allen concluded that L. was sexually abused by father. Ms. Allen concluded also that there is a "high likelihood" that N. has been abused and concludes that she is at high risk of abuse if she is in the presence of father. Certain therapeutic recommendations were made, as well as the recommendation that father not be allowed unsupervised contact with his daughters.

Art therapy was used with L. by Karen Stabley at the Lehman Center. Ms. Stabley, an art therapist for seven years, testified that her evaluation of L. and her drawings led her to conclude that L. had been sexually victimized by father. Ms. Stabley stated that 50 percent of the children she sees have been sexually or physically abused.

When the court met with the children, L. was initially very reticent in talking. The court, the court reporter, and two attorneys were present. N. spent her time drawing and was preoccupied with the chore (it is noted that the court's calendar pad was used as the drawing pad). N. was friendly to people and L. did start to talk. She did talk about seeing broken windows, but her grandfather who brought her to court explained that they had seen broken windows.

At times, the verbalizations made by both L. and N. were difficult to put into context with testimony of other witnesses (such as N.'s stories of bleeding) and, overall, the court finds that the girls' statements and behavior were inconsistent.

Mother and Mr. F. married on February 29, 1992, and left for a honeymoon in the Bahamas and came back on March 8, 1992. Upon arrival at home, they were informed of the allegations. Mr. F. testified that after the report was filed, L. told him that "Daddy jugged me in the wee-wee." He has also heard L. say "smell my butt," and also testified that, after the report was filed, he saw L. and N. playing. L. asked N. what they should talk about today and then told N., "Daddy hurt my wee-wee." N. responded to L., saying "I know, he hurt my wee-wee also." Mr. F., by his testimony and demeanor, established that he does not like Mr. D. He also stated that the girls call Mr. D. "Daddy," which, given his testimony, he does not like.

Mother testified that L. had, after visiting with father in 1991, periodically grabbed people's crotches. Mother said she told L. not to do this. No disclosures occurred, however, in 1991; the first disclosure occurred when the children were left with the maternal grandparents while the mother went on her honeymoon. Mr. D.S. (the maternal grandfather) testified that L. told him that daddy rubs her wee-wee. The next day L. told the grandparents that her father walked around the house without any clothes on. The agency was then contacted and informed of these disclosures by the grandparents. Given the disclosures, the grandparents and the mother testified that, upon reflection, L. had acted inappropriately at times upon return from father's house in 1991. They recalled L. saying, "smell my wee-wee," "smell me here" (her genital area), and grabbing people's crotches. Mother did testify that when she changed the children's diapers, she did smell in that area of the children.

The maternal grandparents stated that N. had told her that father had hurt her wee-wee and, on occasion, N. held herself tight and yelled, "No cream, no cream."

A.S. and D.T. testified that each has heard each child individually say that daddy hurt her and/or "smell my wee-wee." Ms. S. heard N. say that father had poked her real hard and hurt her.

M.D., father's sister-in-law, supervised visits by father with his daughters. She testified that the girls were happy and glad to see father and that she, at no time, saw any untoward act by father, nor anything unusual from the girls.

Mr. L.D. (the paternal grandfather) was a witness for father. He never saw the girls exhibit fear of father. The girls would visit the grandfather at his store and he did indicate he saw L. in December of 1990 grab an elderly lady in the crotch and that L. was a little backward with all men. D.W., a girlfriend of father, had dated father for 10 months, until October 1992. She did not see the girls as fearful of father and she thought the girls were good kids. She did have L. grab her in the crotch area and Ms. W. told her not to do that.

Father adamantly denies all of the allegations against him that he has abused or acted inappropriately with his daughters. Father contends that mother has fabricated these allegations to try and get him out of the picture. Although father indicated he did state that mother and Mr. F. could adopt the children, he only made the offer thinking he would get an answer to why these allegations were being made. March 6, 1992, was the last time father saw his daughters unsupervised.

The court finds father credible in his denial of these allegations.

Michael Ditsky, a licensed psychologist, evaluated the parents, the girls, and Mr. F. MMPIs, Bender-Gestalt, and Rorschach tests were conducted on the parents and Mr. F. Clinical interviews were also conducted.

Mr. Ditsky concluded from his testing of father that there were no indicators present to show father was a perpetrator. Father's profile was that he had good ego strength and was basically within normal limits as to his psychological profile. He did have an indication of over-controlled hostility, but Mr. Ditsky stated that father accepted responsibility for that.

As to mother's psychological profile, she came out extremely high for over-controlled hostility and repression. Mr. F. was given the same tests and his profile showed a problem with authority figures and that he was impulsive and has mood swings.

Mr. Ditsky also recommended supervised visits with father and his girls. Mr. Ditsky, based on his review of the tests, and his observation of father, mother, the girls and Mr. F., concluded with reasonable degree of psychological certainty that (1) the girls have not been sexually abused, and (2) father did not sexually abuse either, or both, of his daughters.

Father and Mr. Ditsky indicated that L. heard things from mommy, G., or everybody.

Mr. Ditsky testified that the children did not present any signs that typically classify a child as being sexually abused. He also documented the interaction of the children with father as being comfortable and happy. The children involved father in their play and, on one occasion, L. returned to the playroom for the purpose of drawing a heart for father.

No physical evidence has been presented to substantiate those allegations, particularly with respect to N. Testimony alleged that she had been harmed to the point that she bled, yet no physicians were offered to show that any such physical harm had occurred.

The court adopts the reasoning of Judge Wettick in the case of *Donna S. v. Bernard S.*, 137 Pitt. Leg. J. 173 (1989). Judge Wettick carefully and concisely delineated the burdens of proof in "normal" custody cases, custody cases in which sexual abuse allegations are raised, and cases in which the sexual abuse allegations are the subject of criminal proceedings. The preponderance of the evidence test is applicable to determine the best interest and welfare of a child in regular custody cases. For cases involving criminal charges arising from alleged sexual abuse by a parent of a child, the burden of proof becomes beyond a reasonable doubt. Judge Wettick, in a case where the mother sought only supervised contact by the father with his daughters because of alleged sexual abuse by the father of the daughters, construed the case as if it was a dependency proceeding and required the mother to show "clear and convincing evidence that the father had committed sexual abuse upon his daughter." This reasoning arose from Judge Wettick's balancing of a parent's right to have "regular and meaningful" contact with his or her child with that of a child living in a "safe and wholesome environment." *Id.* at 175.

This court, by this ruling, adopts the clear and convincing burden of proof for a parent attempting to substantiate that the other parent has committed sexual abuse against a child who is the subject of a custody proceeding. This burden must be met in order for this court to impede, restrict or suspend a parent's right of custody. The overriding best interest and welfare test will constantly be applicable in any custody proceeding, but where the issue of sexual abuse is interjected by a parent as rationale to limit or suspend the other parent's custodial rights, the threshold issue which must be established by clear

and convincing evidence is, did the parent sexually abuse his or her child? The resolution of that issue will affect the application of the best interest and welfare test for custodial arrangements.

The dilemma for the court, when witnesses are generally credible, is how to recognize two opposite contentions. Ms. Utz is credible in how she handled the interviews, yet she did not do any testing, nor have extended contact with mother and father. Ms. Allen and Ms. Stabley are credible in that they appropriately handled the interviewing of the children. However, at no point did they interview father to factor in his version of the facts. Sue Allen, Karen Stabley, and Cathy Utz were more reactive then active in interviewing techniques.

Of note to the court is the time that each child felt safe during the interviews because of mother's presence. The children would go back and forth to mother during interviews with the various professionals involved in this case. This type of check-in is consistent with a false allegation of abuse as noted by Dr. Arthur H. Green in his "True and False Allegations of Sexual Abuse in Child Custody Disputes."

The one witness who has had contact and evaluated all of the parties and the children is Mr. Ditsky. The court also notes that he is the one person trained in interviewing and evaluating individuals as to their psychological profiles. His findings are what ultimately defeat mother's attempt to establish by clear and convincing evidence that L. and N. have been sexually abused by father.

Given that the court rejects that father has perpetrated sexual abuse upon either of his daughters, the court then,

ironically, finds consistency among the witnesses that L. and N. have suffered from emotional trauma from whatever source. Mr. Ditsky, Sue Allen, Karen Stabley, and Cathy Utz all agreed that for a period of time, father should have a supervised contact with his daughters. These witnesses are clear and convincing to the court that this contact will aid in father and his daughters resuming a normal relationship. As such, father will have supervised contact with L. and N. at his sister-in-law's house, with the first Saturday from noon to 6 p.m. The visits shall then progress from Saturday, from noon until 6 p.m. and Sunday, from noon until 6 p.m. During this time, father and the daughters shall undergo counseling through Rost and Associates, Dr. Brian Stevens, or Nancy Pendergast. Father, through his counsel, shall identify the counselor, and shall provide the name of the counselor to the court and attorney DeArment. At all times, the mother shall cooperate in making the children available for counseling and shall transport the children to the sessions. The counselor is directed that as soon as the counselor deems it appropriate, father shall resume normal, unsupervised custody rights with his daughters. Those rights shall include every other weekend, three weeks in the summer, alternate holidays, and Father's Day.

The court, in its ruling today, does not denigrate the investigation performed by the caseworker as to alleged abuse, nor does the court adopt a finding that the recommendation of an evaluator (such as a psychologist) will be given greater weight than that of a caseworker. In weighing the evidence in this particular case, the court is finding that mother has not clearly and convincingly established that father sexually abused his daughters.

Father did request full custody, but the court will deny that request, because the court finds that L. and N. are bonded with mother and to change that would, in all likelihood, cause adverse impact upon the children.

The following order will be entered.

## ORDER

Mother, T.M.S.F., and father, C.L.D., are the parents of L.M.D., date of birth July 21, 1988, and N.L.D., date of birth January 6, 1990. Mother and father shall share legal custody of the children. Majority physical custody shall be awarded to mother.

Father shall have the following rights of visitation and then rights of minority physical custody:

(1) Commencing February 27, 1993, from noon until 6 p.m., and then, February 28, 1993, from noon until 6 p.m., and alternating, thereafter, on a weekend basis. Said visits shall be supervised by the sister-in-law, or another appropriate adult, at the home of the sister-in-law. Father shall not be left unsupervised with either L. or N. Father's rights shall then be on an alternative weekend basis.

(2) Father shall immediately commence counseling with Rost and Associates, or with Dr. Brian March. He shall advise his counsel of the name of the counselor within 14 days of the date of this order. Counsel shall then notify the court and other counsel of the name and address of the counselor. The children shall participate in counseling as the counselor deems appropriate. Father and mother shall be equally responsible for the costs of the counseling sessions involving the children and shall immediately pay said invoices upon presentation.

(3) The counselor shall receive a copy of this order.

(4) Expansion of father's rights of both supervised and unsupervised custody shall occur as the counselor recommends. The intent is to have father's rights of custody expand to be reflective of a standard order of every other weekend, from Friday at 6 p.m. to Sunday at 6 p.m., Father's Day from 9 a.m. to 6 p.m., three weeks in the summer, Christmas Eve or Christmas Day and alternate holidays, with said holidays being Easter, Memorial Day, July 4th, Labor Day, Halloween, Thanksgiving and New Year's Day. Father's first holiday shall be Easter.

(5) Should the counselor deem it appropriate, the art and play therapists may be consulted and, if deemed appropriate, the children referred to them for counseling. Mother shall be totally responsible for the costs of these therapists and shall cooperate in making the children available.

(6) Mother shall transport the children to and from visits with father and to the counselor's office. Furthermore, she shall make the children available for sessions at the counselor's office, but shall be present during these sessions. The sessions are to occur at times other than father's scheduled time of custody.

(7) Should the counselor deem it appropriate, mother shall meet with the counselor at her expense.

(8) Mother shall cooperate with the counselor and, at all times, shall not make any disparaging comments to the children concerning father and this matter. The mother's family is also ordered to comply with this provision.

Copies of this order are to be sent to counsel of record, who shall provide a copy to his or her respective client, Sue Allen, Michael Ditsky, and Cathy Utz. A copy shall also be provided by father's counsel to either Rost and Associates or Dr. Brian March.